UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,         Court File No. 15-cr-165 (JRT/LIB) (32)

        Plaintiff,

v.         **REPORT AND RECOMMENDATION**

Burney Abdulah Peoples,

        Defendant.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon Defendant Burney Abdulah Peoples' ("Defendant") Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 599]. The Court held a motions hearing on October 20, 2015, regarding the parties' pretrial motions.[1] In regards to the motion to suppress, the parties requested an opportunity to submit supplemental briefing which has been completed and the motion to suppress was taken under advisement on November 15, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 599], be **DENIED**.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate order. [Docket No. 983].

## I.   BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant is charged with one count of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone in violation of 21 U.S.C. § 841(a)(1). (Indictment [Docket No. 1]).

### B.  Facts

On March 2, 2015, the Government submitted an Application for the Interception of Electronic and Wire Communications for Target Telephone #1. (Gov't Ex. 7, at 001).[2] According to the Government, Target Telephone #1 ("TT–1") was known to be used by Omar Sharif Beasley ("Beasley") in furtherance of drug trafficking related activities. (Id. at 002). The application included an affidavit ("TT–1 Aff.") prepared by Drug Enforcement Administration Special Agent Travis Ocken in support of the application. (Id. at 017–89).

On March 26, 2015, the Government filed an Application for the Interception of Wire Communications for Target Telephone #3. (Gov't Ex. 8, at 001). The Government alleged that Beasley was using Target Telephone #3 ("TT–3") in furtherance of drug trafficking related activities. (Id. at 002). As part of that application, Special Agent Ocken submitted a supporting affidavit ("TT–3 Aff.").

In both affidavits, Special Agent Ocken attested that the interception of wire communications over TT–1 and TT–3 was necessary to obtain information in furtherance of the goals and objectives of the investigation of the Beasley DTO,[3] including:

---

[2] Neither exhibits 7 nor exhibit 8 are internally consecutively paginated, therefore, for ease of reference, when referring to the exhibit as a whole the page number referenced in each exhibit refers to the last three digits of the Bates stamp. When referring to the affidavits, as opposed to the exhibit as a whole, the citation will be to the paragraph in the appropriate affidavit.

[3] Beasley DTO is used throughout Special Agent Ocken's affidavit in reference to the Beasley Drug Trafficking Organization.

(a) The full scope, methods, extent, and personnel involved in the drug trafficking conspiracy discussed in this Affidavit and other drug trafficking organizations not yet identified to date;

(b) The identifies and roles of the members of the Omar BEASLEY DTO, including suppliers, sellers, buyers, couriers, financiers, and other co-conspirators involved with the Omar BEASLEY DTO;

(c) The period of operation of the Omar BEASLET DTO;

(d) The management, disposition, and money laundering of revenues and proceeds obtained by the Omar BEASLEY DTO; and

(e) The identity of assets held under fictitious names.

(TT–1 Aff. at ¶ 137, TT–3 Aff. at ¶ 161).

Special Agent Ocken indicated that conventional methods used to investigate drug conspiracies (e.g. physical surveillance, records checks, informant interviews, pen registers, and analysis of toll records), had not provided sufficiently specific information as to the identity of all of the members of the conspiracy, the methods the organization used to transport drugs, or where and how the drugs were stored. (TT–1 Aff. at ¶ 137, TT–3 Aff. at ¶ 161). Special Agent Ocken further asserted that the techniques used in the current investigation had not enabled law enforcement to locate the organization's source of supply or all of the organization's drug customers. (TT–1 Aff. at ¶ 137, TT–3 Aff. at ¶ 161).

On March 2, 2015, United States District Judge John R. Tunheim issued an order authorizing the interception of electronic and wire communications from TT–1 for a period of 30 days. (Gov't Ex. 7, at 092). Judge Tunheim found that there was probable cause to believe that the targets of the interception had been and continued to commit actions in furtherance of drug trafficking crimes and that the interception of communications from TT–1 will concern communications dealing with the commission of drug trafficking crimes. (Id. at 090–092). The Court also found that normal investigation procedures had been tried without success and

reasonable appeared to be unlikely to succeed if tried, or were too dangerous to employ. (Id. at 092).

On March 26, 2015, United States District Judge Joan N. Ericksen issued an order authorizing the interception of wire communications from TT–3 for a period of 30 days. (Gov't Ex. 8, at 111). Judge Ericksen, like Judge Tunhiem with TT–1, found that there was probable cause to believe that the targets of the interception had been and continued to commit actions in furtherance of drug trafficking crimes and that the interception of communications from TT–3 would concern communications dealing with the commission of drug trafficking crimes. (Id. at 109–11). The Court also found that normal investigation procedures had been tried without success and reasonable appeared to be unlikely to succeed if tried, or were too dangerous to employ. (Id. at 111).

Both Judge Tunheim and Judge Ericksen were provided the following information in support of the respective applications for interception of wire communications to demonstrate the necessity of those interceptions.

## 1. Confidential Informants

Special Agent Ocken identified six confidential informants that had been consulted and interviewed during the course of the investigation. Special Agent Ocken stated that CS3 had been able to obtain distribution quantities of heroin and methamphetamine from Beasley during two separate controlled purchases as well as heroin from Lee Oppegard, which was also arranged through Beasley. (TT–1 Aff. at ¶¶ 66–86; TT–3 Aff. at ¶¶ 68–88).

Special Agent Ocken attested that CS1 initiated contact with law enforcement after receiving threats from Beasley over money CS1 had purportedly stolen from Beasley. (TT–1 Aff. at ¶ 33; TT–3 Aff. at ¶ 35). CS1 stated that s/he had rented cars for Beasley, which CS1

believed Beasley was using to traffic controlled substances, and CS1 witnessed Beasley leave a shoe box containing money in the front seat of a black Dodge Charger that was parked in a storage locker. (TT–1 Aff. at ¶¶ 34–35; TT–3 Aff. at ¶¶ 36–37).

With respect to other confidential informants, Special Agent Ocken attested that CS2 stated that beginning in June 2014, Beasley began supplying CS2 with user quantities of heroin and CS2 developed a one gram per day addiction; at which time CS2 began spending everyday with Beasley while involved in a sexual relationship with Beasley. (TT–1 Aff. at ¶ 50; TT–3 Aff. at ¶ 52). CS2 stated that s/he sold 1-2 gram quantities of heroin for Beasley in Beasley's presence which Beasley weighed and packaged, observed Beasley giving drugs to other members of the Beasley DTO, and sampled heroin provided by others in the presence of and at the direction of Beasley. (TT–1 Aff. at ¶¶ 51–53; TT–3 Aff. at ¶¶ 53–55). CS2 further stated that while at a residence with Beasley she observed three to four kilograms of heroin inside the residence, and CS2 identified Christopher Peoples, Dominguez, Barrett, April Graves, and others as individuals who sold heroin for Beasley. (TT–1 Aff. at ¶ 56; TT–3 Aff. at ¶ 58). Special Agent Ocken attested that some of the names and addresses given by CS2 were verified by law enforcement. CS2 also stated that s/he observed Beasley in possession of a Glock .40 caliber handgun which Beasley told CS2 he was not able to legally purchase. (TT–1 Aff. at ¶ 58; TT–3 Aff. at ¶ 60). Instead, Beasley informed CS2, that Beasley gave someone named Baker money to purchase the hand gun for Beasley. (TT–1 Aff. at ¶ 58; TT–3 Aff. at ¶ 60).

Special Agent Ocken attested that CS4 is aware of the Beasley DTO through Beasley's mother, Deloris Beasley. (TT–1 Aff. at ¶ 87; TT–3 Aff. at ¶ 89). CS4 observed Deloris receiving a FedEx package containing approximately $40,000–$50,000, which Deloris said was from Omar Beasley. (TT–1 Aff. at ¶ 89; TT–3 Aff. at ¶ 91). CS4 also observed Omar Beasley giving

Deloris Beasley a duffle bag containing a large quantity of United States currency, which CS4 estimated to be approximately $250,000. (TT–1 Aff. at ¶ 90; TT–3 Aff. at ¶ 92). CS4 was also able to identify various members of the Beasley family and the Beasley DTO. (TT–1 Aff. at ¶ 92; TT–3 Aff. at ¶ 94).

CS5 provided law enforcement with Beasley's then current phone numbers, which agent were able to verify, informed law enforcement that Beasley leased high-end vehicles, and informed law enforcement that Beasley made the payments for said vehicles in large amounts of cash or wire transfers. (TT–1 Aff. at ¶ 94; TT–3 Aff. at ¶ 96).

CS6 admitted to law enforcement that s/he had purchased heroin from Beasley on three separate occasions and observed Beasley in possession of approximately 100–200 grams of heroin at one time. (TT–1 Aff. at ¶ 98; TT–3 Aff. at ¶ 100). Law enforcement directed CS6 to make monitored and recorded calls to Beasley which resulted in CS6 purchasing ½ gram of heroin from Lucas Peterson and calls with Beasley about purchasing large quantities of heroin from Beasley directly. (TT–1 Aff. at ¶¶ 100–06; TT–3 Aff. at ¶¶ 102–08).

**2. Controlled Purchases**

Special Agent Ocken attested that between January 29, 2014, and December 16, 2014, law enforcement conducted four controlled purchases of narcotics from members of the Beasley DTO. (TT–1 Aff. at ¶ 138; TT–3 Aff. at ¶ 162). Specifically, law enforcement conducted two controlled purchases directly from Beasley which were arranged through recorded telephone calls and text messages. (TT–1 Aff. at ¶ 138; TT–3 Aff. at ¶ 162). Law enforcement also conducted a controlled buy from Lee Oppegard, which was arranged through Beasley, and an additional controlled buy from Lucas Peterson, who was at the time known to be a member of the Beasley DTO. (TT–1 Aff. at ¶ 138; TT–3 Aff. at ¶ 162). Special Agent Ocken further attested

that despite the successfulness of the controlled purchases, he did not believe that controlled purchases alone would provide law enforcement with all the information it needed to meet the goals of the investigation, including the identifying the sources of supply and all of the co-conspirators responsible for furthering the activities of the Beasley DTO. (TT–1 Aff. at ¶ 139; TT–3 Aff. at ¶ 163).

### 3. Undercover Investigations

Special Agent Ocken also attested that as of the date of the applications no undercover police officers have been able to infiltrate the Beasley DTO. (TT–1 Aff. at ¶ 140; TT–3 Aff. at ¶ 164). Special Agent Ocken further attested that he knew of no avenue in which an undercover agent would be able to infiltrate the Beasley DTO while being assured of the agent's safety and abiding by the prescribed standards of conduct. (TT–1 Aff. at ¶ 140; TT–3 Aff. at ¶ 164).  In the event a target would meet with an undercover agent, Special Agent Ocken opined, the information obtained would be particularized to one or two targets and not the Beasley DTO as a whole. (TT–1 Aff. at ¶ 140; TT–3 Aff. at ¶ 164). Consequently, Special Agent Ocken did not believe it likely that attempts to introduce undercover agents would present an alternative means of obtaining information that could be obtained through electronic monitoring. (TT–1 Aff. at ¶ 140; TT–3 Aff. at ¶ 164).

### 4. Physical Surveillance

Special Agent Ocken attested that only limited physical surveillance had been conducted of Beasley for a number of reasons. (TT–1 Aff. at ¶ 141; TT–3 Aff. at ¶ 165). Special Agent Ocken attested that the reasons included that Beasley operated primarily in remote regions, specifically Native American Reservations, which are difficult for law enforcement to infiltrate and remain unnoticed; that Beasley used numerous residences within those communities; and

that Beasley used numerous techniques to hinder detection by law enforcement. (TT–1 Aff. at ¶ 141; TT–3 Aff. at ¶ 165). Specifically, Beasley used vehicles rented and driven by third persons unknown to law enforcement, had those drivers employ counter-surveillance driving methods, travelled long distances in short amounts of time across multiple jurisdictions, and turned his phone off at certain times to avoid tracking by law enforcement. (TT–1 Aff. at ¶ 142–44; TT–3 Aff. at ¶ 166–68).

By way of example, Special Agent Ocken reported that on December 16, 2014, following a controlled purchase from Beasely by CS3, Beasley told CS3 that Beasley would have heroin for CS3 by the next morning. (TT–1 Aff. at ¶ 144; TT–3 Aff. at ¶ 168). Law enforcement monitored Beasley's cell site data in order to determine where he would obtain the heroin and law enforcement conducted physical surveillance outside the hotel Beasley was known to be located. (TT–1 Aff. at ¶ 144; TT–3 Aff. at ¶ 168). When Beasley left in a car driven by an unknown third party, law enforcement attempted to track Beasley using cell site data from Detroit Lakes to Minneapolis metropolitan area, but law enforcement was unable to reestablish physical surveillance once Beasley entered the Minneapolis metropolitan area because cell site data gave a 10–15 block location approximation and Beasley had turned off his phone one hour later. (TT–1 Aff. at ¶ 144; TT–3 Aff. at ¶ 168).

Special Agent Ocken further attested that given the one-on-one nature of discussing controlled substance purchases, any physical surveillance that could be conducted would not succeed in meeting law enforcement goals in the absences of information obtained from wire surveillance.  (TT–1 Aff. at ¶ 145–46; TT–3 Aff. at ¶ 169–70).

**5. Trash Searches**

Special Agent Ocken attested that as of the date of the application, no trash searches had been conducted in the Beasley DTO case.  (TT–1 Aff. at ¶ 147; TT–3 Aff. at ¶ 171). Special Agent Orcken attributed the lack of trash searches to the fact that Beasley never stayed in the same residence for an extended period of time, but instead, he frequently moved between hotels and the residences of drug customers and distributors. (TT–1 Aff. at ¶ 147; TT–3 Aff. at ¶ 171). Special Agent Ocken further attested that, in his training and experience, trash searches are typically of only limited value, in cases such as the present one because they do not provided data as to the quantity of drugs that may exist in the location and they carry an inherent risk of detection.  (TT–1 Aff. at ¶ 148; TT–3 Aff. at ¶ 172). In regard to the present case, Special Agent Ocken attested that the trash searches would be of limited value because they are most helpful in obtaining search warrants and they would be of limited value because Beasley rarely stays at his listed address or in any one place for any extended period of time. (TT–1 Aff. at ¶ 148; TT–3 Aff. at ¶ 172).

**6. Use of Grand Jury Subpoenas**

Special Agent Ocken attested that, as of the date of his application, no grand jury subpoenas had been used in this investigation. (TT–1 Aff. at ¶ 149; TT–3 Aff. at ¶ 173). Based on his training and experience, Special Agent Ocken opined that grand jury subpoenas would not be effective in the investigation because they would only serve to provide information already known to law enforcement, would alert Beasley to the existence of the ongoing investigation, and if any participants were called to testify before the Grand Jury they would most likely invoke their Fifth Amendment privileged. (TT–1 Aff. at ¶ 149–52; TT–3 Aff. at ¶ 173–76). Special Agent Ocken further attested that alerting Beasley to the existence of the investigation would

allow Beasley to change the operational features of his organization, give Beasley the chance to be more cautious in his operation, allow Beasley time to flee to avoid investigation, give Beasley the opportunity to threaten the lives of informants, or otherwise compromise the investigation. (TT–1 Aff. at ¶ 149–52; TT–3 Aff. at ¶ 173–76).

### 7. Pen Registers and Toll Records

As of the date of Special Agent Ocken's first warrant application in the present case, special Agent Ocken attested that law enforcement had used five Pen Registers and collected toll data for numerous telephones used by members of the Beasley DTO. (TT–1 Aff. at ¶ 153; TT–3 Aff. at ¶ 177). For example, on October 30, 2014, a court authorized the use of a Pen Register for Prior Telephone 1, used by Beasley. (TT–1 Aff. at ¶ 153; TT–3 Aff. at ¶ 177).

On December 10, 2014, a court authorized the use of a Pen Register for Prior Telephone 2, used by Beasley. (TT–1 Aff. at ¶ 153; TT–3 Aff. at ¶ 177). On January 22, 2015, and January 29, 2015, United States Magistrate Judge Hildy Bowbeer signed and authorized the use of a Pen Register on Prior Telephone 3 and Prior Telephone 4, respectively. (TT–1 Aff. at ¶ 153; TT–3 Aff. at ¶ 177). On February 20, 2015, United States Magistrate Judge Janie Mayeron signed and authorized the use of a Pen Register on TT–1. (TT–1 Aff. at ¶ 153; TT–3 Aff. at ¶ 177).

Special Agent Ocken attested that while the previously obtained information had been valuable, it was limited in that it would not reveal the substance of the conversations. (TT–1 Aff. at ¶ 154; TT–3 Aff. at ¶ 178). He further attested that the results of Pen Registers and toll data alone will not succeed in meeting law enforcement's goal of identifying the full extent of the Beasley DTO conspiracy. (TT–1 Aff. at ¶ 154; TT–3 Aff. at ¶ 178).

**8. Search Warrants**

According to Special Agent Ocken, law enforcement officers have obtained and executed several search warrants during the course of the investigation which have resulted in seizure of significant quantities of heroin, drug paraphernalia, and financial documents. (TT–1 Aff. at ¶ 155; TT–3 Aff. at ¶ 179). Special Agent Ocken attested, however, that although the evidence obtained has been valuable, it has not revealed the full scope of the Beasley DTO conspiracy. (TT–1 Aff. at ¶ 156; TT–3 Aff. at ¶ 180). Even in those situations that have resulted in arrests and prosecutions, little direct evidence had been found as to Beasley, the identity of all of the various conspiracy members, or Beasley's sources of supply. (TT–1 Aff. at ¶ 156; TT–3 Aff. at ¶ 180). Special Agent Ocken further attested that search warrants are of limited value in the present case because law enforcement is aware that Beasley limits his direct contact with and direct possession of drugs through the use of intermediaries both in transportation and distribution. (TT–1 Aff. at ¶ 157; TT–3 Aff. at ¶ 181).

In his affidavit, Special Agent Ocken further stated that, in his experience, it would be highly unlikely to obtain evidence incriminating all or even most of the conspiracy participants at any one location because a large scale conspiracy, such as the Beasley DTO, uses multiple locations including residences and business and hotels rooms to conceal the controlled substances and proceeds. (TT–1 Aff. at ¶ 158; TT–3 Aff. at ¶ 182). In addition to the mobility and multiple locations of the Beasley DTO, Special Agent Ocken attested that, in his training and experience, there is a finite and relatively short time period in which the targets are in possession of the drugs or the proceeds and that the records, if kept, are easily destroyed. (TT–1 Aff. at ¶ 159; TT–3 Aff. at ¶ 183).

For the reasons Special Agent Ocken put forth, he stated that in his training and experience, it was unlikely that search warrants would, by themselves, yield evidence from which the interstate drug sources and couriers could be effectively prosecuted. (TT–1 Aff. at ¶ 159; TT–3 Aff. at ¶ 183).

**9. Review of Financial Records**

In his affidavit, Special Agent Ocken asserts that he believes that Beasley is using bank accounts, wire transfer services, and bulk currency to collect, transport, disseminate, and launder proceeds derived from the illegal sale of controlled substances by the Beasley DTO. (TT–1 Aff. at ¶ 160; TT–3 Aff. at ¶ 184). The financial investigation showed that Beasley was directing others to deposit drug proceeds in to his Wells Fargo account in increments under $10,000. (TT–1 Aff. at ¶ 160; TT–3 Aff. at ¶ 184). Those funds were later withdrawn in a short amount of time and the debit card linked to that account was used to pay for hotel rooms associated with the Beasley DTO. (TT–1 Aff. at ¶ 160; TT–3 Aff. at ¶ 184). From further analysis and investigation of records obtained from MoneyGram and RIA, agents learned that Beasley had received and sent money to persons, including identified co-conspirators, using these wire transfer services. (TT–1 Aff. at ¶ 161; TT–3 Aff. at ¶ 185).

While this financial information has been valuable in identifying co-conspirators, Special Agent Ocken opined that this method was not likely to provide information sufficiently specific as to the conduct, participation, and scope of the Beasley DTO to obtain criminal convictions for all of the members of the organization or to reveal the organization's source of supply. (TT–1 Aff. at ¶ 162; TT–3 Aff. at ¶ 186).

**10. Information Only Contained in the TT–3 Application Affidavit[4]**

Judge Ericksen was also provided the following additional information in support of the TT–3 application for interception of wire communications.

**a. Physical Surveillance**

On March 8, 2015, agents became aware that Beasley was in Detroit, Michigan, attempting to procure a quantity of heroin, but on that same date Beasley's phone TT–1 was turned off, and no cell data could be obtained. (TT–3 Aff. at ¶ 168). Special Agent Ocken attested that agents believe Beasley turned off his phone to further frustrate surveillance when he is obtaining or travelling with narcotics. (Id.). The following day, TT–1 was turned back on and agents were able to determine that Beasley was near Wilson, Wisconsin, travelling in the general direction of the Minneapolis area. (Id.). Agents established surveillance along the interstate as they believed Beasley was transporting a quantity of heroin, but were unable to locate him, so they established surveillance at two locations he was known to use while in the Minneapolis area, the Quality Inn hotel and 3404 Columbus Avenue S., Minneapolis, Minnesota. (Id.). During this surveillance, agents observed a Pontiac Bonneville travel from the hotel to the residence, and then depart the residence followed by a tan Jeep. (Id.). Agents followed the two cars back to the hotel. (Id.). At both locations, agents observed several black males and Native American males and females. (Id.). On three separate occasions agents followed the Jeep back to the residence, and on the third occasion noted that it was followed back to the hotel by a 2011 white BMW, which is the car Beasley was believed to have driven from Detroit, Michigan. (Id.).

---

[4] Only the sections containing information additional to the TT–1 Aff. are addressed below. TT–3 Aff. contains all of the information in TT–1 plus the additional information presented below. This additional information was not provided in the application to Judge Tunheim because it was information acquired resulting from the intercept Judge Tunheim authorized.

Later that same day, agents observed Beasley, Sarah Thompson, Rayshawn Peoples, Timothy Beaulieu, William Alonzo, and several unidentified individuals exit the hotel carrying bags and luggage, many of which were placed in the back of the tan Jeep. (Id.). Agents observed Beasley, Thompson, and others get into the white BMW; Beaulieu get into the Jeep; and Peoples and others get in to the Bonneville. (Id.). Agents then maintained surveillance as all three vehicles traveled in tandem west on Interstate 94. (Id.). The Bonneville and BMW exited the Interstate at two separate exits at which time surveillance on those two vehicles was terminated. (Id.). Approximately one hour later, at the direction of case agents, Troopers with the Minnesota State Patrol conducted a traffic stop on the Jeep for traffic related offenses at which time Beaulieu was identified as the driver and Alonzo was identified as the only passenger. (Id.). A subsequent search of the vehicle revealed two tubular shaped packages, wrapped in black electrical tape, each containing approximately 100 grams of heroin; a clear plastic bag containing approximately 350 prescription pills, including approximately 200 pills of suspected Oxycodone; and a Glock 9mm handgun which had been reported stolen from Detroit, Michigan. (Id.). Troopers also located and seized drug packaging, a scale, and several bottles of lactose, believed to be used to "cut" the heroin. (Id.).

### b. Pen Registers and Toll Records

As of the date of Special Agent Ocken's TT–3 Affidavit, law enforcement had obtained two additional Pen Registers. (TT–3 Aff. at ¶ 177). On February 27, 2015, United States Magistrate Judge Janie Mayeron signed an order authorizing the use of a Pen Register on TT3. (Id.). On March 2, 2015, the order was sent to Verizon; Verizon, however, advised law enforcement that the telephone number was a pre-paid telephone and service had been

discontinued on February 22, 2015. (Id.). Based on that information the Pen Register was not activated. (Id.).

### c. Electronic Surveillance

On March 2, 2015, Judge Tunheim signed the order authorizing the interception of wire and electronic communications for TT–1 for a period of 30 days. (TT–3 Aff. at ¶ 187). Interception of wire and electronic communications over TT–1 began March 2, 2014. (Id.). Based on intercepted telephone calls agents learned that, as reported by Beasley, TT–1 was stolen from Beasley but that Beasley was able to reacquire TT–1. (Id.). On March 8, 2015, at approximately 3:00 P.M., TT–1 was again turned off while Beasley was in Detroit, Michigan, where agents believed he was attempting to procure a quantity of heroin. (Id.).

On March 13, 2015, law enforcement discovered that TT–1 was no longer in use and contacted Verizon Electronic Surveillance Department, which advised that Beasley has contacted Verizon and changed (ported) his telephone number from TT–1 to TT–2 but maintained the same handset with the same IMEI number. (TT–3 Aff. at ¶ 188). That same day, per Judge Tunheim's previous authorization, agents began intercepting electronic and wire communications over TT–2. (Id.). On March 14, 2015, law enforcement observed a high volume of text messages and no telephone calls on TT–2, which law enforcement found unusual. (Id.). Law enforcement visually confirmed that Beasley was at the Quality Inn in Brooklyn Center, Minnesota, but the GPS Ping data for the TT–2 showed that TT–2 was in Indianapolis, Indiana. (Id.). Based on that information, law enforcement believed Beasley left TT–2 with his son. (Id.). Accordingly, on March 14, 2015, at 4:12 P.M., interceptions of electronic and wire communications on TT–2 were stopped by law enforcement. (Id.).

In his Affidavit, Special Agent Ocken attest that interceptions of electronic and wire communications on TT–1 and TT–2 lasted approximately twelve days before interceptions were stopped by law enforcement after they learned that Beasley was no longer using TT–2. (TT–3 Aff. at ¶ 189). During this time, law enforcement identified five additional co-conspirators and intercepted calls with sources of supply, but were unable to identify the identity or location of the sources in the limited interceptions. (Id.). Additionally, agents were able to identify new locations that may be utilized by the Beasley DTO to facilitate drug trafficking activities. (Id.). Special Agent Ocken attest that while the intercepts from TT–1 and TT–2 furthered the investigation, they failed to fully identify the precise nature and scope of the conspiracy or the extent of its illegal activities. (Id.). Special Agent Ocken further noted that the limited intercepts failed to identify the precise manner in which the conspirators obtained and transported controlled substances into Minnesota, North Dakota, and Wisconsin for sale. (Id.).

## II.   DEFENDANT'S MOTION TO SUPPRESS WIRE INTERCEPTIONS, ELECTRONIC SURVEILLANCE, AND OTHER EVIDENCE [Docket No. 599]

Defendant moves this Court for an order suppressing all the evidence obtained from the wire interceptions, electronic surveillance, and other related evidence, arguing that law enforcement in the present case "did not attempt all investigative techniques at their disposal." (Def.'s Mem. in Support of Mot. to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 953]). Defendant argues implicitly that law enforcement failed to meet the necessity requirement of 18 U.S.C. § 2518(1)(c) by not attempting all investigation techniques available, reasoning that normal investigative procedures had not been tried and failed nor reasonably appeared to be unlikely to succeed if tried. (Id. at 3). Defendant, therefore concludes, that '[o]btaining the wiretaps was essentially a fishing expedition" because law enforcement had not used all other investigative techniques first and also possessed enough

16

probable cause to proceed to indictment for 37 people. Defendant does not argue that probable cause did not exist, but only that law enforcement failed the necessity requirement of the application. (See Id.).[5] The Government argues that law enforcement met the necessity requirement for the use of wire interceptions, and, in any event, law enforcement reasonably relied on the court's authorization in "good faith."

**A.  Standard of Review**

The application for and issuance of wiretaps is governed by 18 U.S.C. § 2518, which states, in relevant part:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
> (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;
>
> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;
>
> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they

---

[5] Defendant also asserts generally in his motion that the government's interception application fails to "particularize offenses" and fails to "contain the identity of all persons known to be committing offenses and whose communications would be intercepted." Def.'s Mot. to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 599]). However, Defendant's motion does not legally or factually support these assertions in his motion, (see Id.), and Defendant does not address either argument in his memorandum. (See Def.'s Mem. in Support of Mot. to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 953]).

reasonably appear to be unlikely to succeed if tried or to be too dangerous;

* * * *

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

* * *

18 U.S.C. § 2518(1), (3).

The necessity requirement of § 2518 insures "that wiretaps are not routinely employed as the initial step in an investigation." United States v. Milliner, 765 F.3d 836, 839 (8th Cir. 2014) (quoting United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003)). "To satisfy the requirement, an application requesting a wiretap order must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Jackson, 345 F.3d at 644 (quoting 18 U.S.C. § 2518(1)(c)). However, the necessity requirement "does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap." United States v. Turner, 781 F.3d 374, 383 (8th Cir. 2015) (quoting United States v.

<u>Macklin</u>, 902 F.2d 1320, 1326 (8th Cir.1990)). "[I]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." <u>Milliner</u>, 765 F.3d at 839 (quoting <u>United States v. West</u>, 589 F.3d 936, 939 (8th Cir. 2009)).

### B. Analysis

In the present case, the wire interception was clearly not the first step in the investigation of the Beasley DTO. On the contrary, Special Agent Ocken attested that law enforcement agents had initially employed several traditional techniques in attempts to achieve the goals of the investigation, such as controlled purchases, physical surveillance, pen registers, review of toll records, search warrants, and review of financial records.[6] Special Agent Ocken detailed in his affidavits supporting the warrant application, as set forth above, the information obtained from each of these techniques, the information these techniques failed to produce, why further use of each of these techniques alone would not produce additional relevant information, and why other techniques, such as trash search, grand jury subpoenas, and undercover agents, could not be expected to produce relevant information or were too dangerous to employ. This detailed information was available to and considered by Judge Tunheim and Judge Ericksen when they issued the warrants for wire interception.

Based on Special Agent Ocken's statements in the TT–1 and TT–3 Affidavits, the Court concludes that law enforcement officers had reasonably and diligently attempted to use available traditional investigative techniques to identify the Beasley DTO sources of supply, all the

---

[6] The Defendant himself recognizes that the Government had probable cause that 45 individuals had committed criminal offenses and outlines the extensive investigation techniques used before the wire interception application. (Def.'s Mem. in Support of Mot. to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 953], at 2).

Beasley DTO co-conspirators, the scope and extent of the conspiracy, and sufficient incriminating evidence against the members of the Beasley DTO necessary for their successful prosecution before seeking out the use of wire intercepts. However, as Special Agent Ocken also established in his statements, those conventional investigatory techniques have not been entirely successful in exposing the full extent of the conspiracy and the identity of all co-conspirators. The affidavits to both warrant applications contain full and complete statements as to which methods would be unsuccessful if tried and why other traditional investigative techniques would not provide additional information as to identifying the Beasley DTO sources of supply, all the Beasley DTO co-conspirators, the scope and extent of the conspiracy, and sufficient incriminating evidence against the member of the Beasley DTO necessary for their successful prosecution.

Therefore, the court finds that the Government has met its statutory burden, under 18 U.S.C. § 2518, with respect to the statement of necessity.

The Court is satisfied that both warrants for the interception of wire communications were authorized, and conducted in good faith. Therefore, assuming arguendo that even if the Court was persuaded that the warrant applications somehow failed to meet the necessity requirement of 18 U.S.C. § 2518, the Court would find that Special Agent Ocken and law enforcement relied upon the Order Authorizing the Interception of Electronic and Wire Communications and the Order Authorizing the Interception of Wire Communication in good faith. See United States v. Moore, 41 F.3d 370, 376 (8th Cir. 1994), cert. denied, 514 U.S. 1121 (1995) (concluding that "good faith" doctrine, first espoused in United States v. Leon, 468 U.S. 897 (1984), applies to electronic surveillance suppression issues).[7]

---

[7]  "Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable

As such, the Court recommends that Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 599], be denied.

## III.   CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 599], be **DENIED**.

Dated: December 2, 2015                                       s/Leo I. Brisbois
                                                             Leo I. Brisbois
                                                             U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

---

cause to issue the warrant." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citing Leon, 468 U.S. at 922). The exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." Leon, 468 U.S. at 919–921; see also, United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed.")

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.